UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

BERKSHIRE BANK,

                        Plaintiff,

        -against-                                        1:11-CV-0767 (LEK/CFH)

NANCY K. TEDESCHI,

                        Defendant.

_____

## MEMORANDUM-DECISION and ORDER

## I.      INTRODUCTION

        This is an action by Plaintiff Berkshire Bank ("Plaintiff") to recover the balance due and

owing on promissory notes executed in Plaintiff's favor by Defendant Nancy K. Tedeschi

("Defendant").  Plaintiff commenced this action by filing a Complaint on July 6, 2011.  Dkt. No. 1

("Complaint").  Presently before the Court are Plaintiff's Motion for summary judgment on the

Complaint's first, second, and fourth causes of action and Defendant's Cross-Motion for summary

judgment dismissing the Complaint in its entirety.  Dkt. Nos. 16 ("Motion"), 22 ("Cross-Motion").

For the following reasons, Plaintiff's Motion is granted in full and Defendant's Cross-Motion is

granted in part and denied in part.

## II.     BACKGROUND

### A.  Factual Background

        Plaintiff is a Massachusetts savings bank with its principal place of business in Pittsfield,

Massachusetts.  Compl. ¶ 2.  Defendant is an individual who resides in East Wenatchee,

Washington.  Id. ¶ 3.  At times relevant to this action, Defendant was involved in the purchase and

sale of real estate and negotiable instruments.  See Defendant's Affidavit in support of her Cross-

Motion (Dkt. No. 22-2) ("Tedeschi Aff.") ¶ 7.  Defendant also previously owned a title company and ran a mortgage bank and is admittedly a "very sophisticated businesswoman."  Plaintiff's Statement of material facts (Dkt. No. 16-2) ("Pl.'s S.M.F.") ¶ 2-3; Defendant's Response to Plaintiff's Statement of material facts (Dkt. No. 22-30) ("Def.'s Resp. S.M.F.") ¶ 2-3; see also Tedeschi Aff. ¶ 34.

Of issue in this case are the large sums of money Defendant borrowed from Plaintiff on several occasions in 2006 and 2007 to finance Defendant's various real estate projects.  The facts surrounding the parties' original financial arrangements are undisputed.  On approximately June 8, 2006, in Clifton Park, New York, Defendant executed an Adjustable Rate Note ("the FL Term Note") in Plaintiff's favor in the original principal amount of $212,000.  Compl. ¶ 14-15; Dkt. No. 12 ("Answer") ¶ 1.  The FL Term Note was secured by a mortgage on Defendant's real property located at 600 South Dixie Highway, Prado Condominium, Unit 353, West Palm Beach, Florida ("the FL Property").  Compl. ¶ 16; Answer ¶ 1.  On approximately November 20, 2006, in Clifton Park, New York, Defendant executed an Adjustable Rate Note ("the NY Term Note") in favor of Plaintiff in the original principal amount of $1,350,000.  Pl.'s S.M.F. ¶ 4; Def.'s Resp. S.M.F. ¶ 4; Compl. ¶ 7.  Nearly a year later, on October 29, 2007, Defendant executed a Homeowner's Equity Account Agreement, Note and Disclosure Statement ("the NY Line-of-Credit Note," and collectively with the NY Term Note, "the NY Notes") in favor of Plaintiff in the original principal amount of $150,000.  Pl.'s S.M.F. ¶ 6; Def.'s Resp. S.M.F. ¶ 6.  The NY Notes (collectively with the FL Term Note, "the Notes") were secured by a mortgage on Defendant's real property located at 257 Riverview Road, Rexford, New York ("the NY Property," collectively with the FL Property, "the Properties").  Pl.'s S.M.F. ¶ 7; Def.'s Resp. S.M.F. ¶ 7.

Between approximately November 2009 and January 2011, Defendant defaulted on the Notes by failing to make the required monthly payments. Pl.'s S.M.F. ¶ 9; Def.'s Resp. S.M.F. ¶ 9; Defendant's Statement of material facts (Dkt. No. 22-29) ("Def.'s S.M.F.") ¶ 2; Compl. ¶ 17. Further, Defendant failed to cure the defaults after Plaintiff sent her proper notice. Pl.'s S.M.F. ¶¶ 10-13; Def.'s Resp. S.M.F. ¶¶ 10-13; Compl. ¶ 18.

Following Defendant's default, Plaintiff and Defendant entered into negotiations on how to resolve the outstanding balance on the Notes. In an effort to avoid foreclosure on the Properties, Defendant requested that Plaintiff accept deeds in lieu of foreclosure. Plaintiff refused Defendant's request and proposed instead a short sale in which Defendant would execute a new promissory note to cover a portion of the difference between what the Properties might fetch in a sale and the amounts alleged to be due on the Notes. Def.'s S.M.F. ¶ 5; Plaintiff's Response to Defendant's Statement of material facts (Dkt. No. 27) ("Pl.'s Resp. S.M.F") ¶¶ 4-5. Defendant refused Plaintiff's request. Def.'s S.M.F. ¶ 5; Pl.'s Resp. S.M.F ¶ 5. While negotiations continued, Defendant informed Plaintiff that if they could not come to an agreement avoiding foreclosure on the Properties, she would file for Chapter 7 bankruptcy. Def.'s S.M.F. ¶ 6.[1]

The parties agree that Defendant executed separate Short Sale Agreements concerning the NY Property and the FL Property on March 1 and June 8, 2010, respectively. Dkt. Nos. 16-10 ("NY Agreement"), 22-19 ("FL Agreement") (collectively, "the Agreements"). Pursuant to the terms of the Agreements, Defendant sold the NY Property for $900,000 and the FL Property for $85,000.

---

[1] Plaintiff challenges Defendant's assertion that "commence[ment of] foreclosure proceedings seeking a deficiency judgment" was the event that would trigger Defendant's filing for bankruptcy. Pl.'s Resp. S.M.F. ¶¶ 6-7. The Court finds that Defendant's communications with Plaintiff clearly show that she meant to file for bankruptcy if they could not agree on an alternative to foreclosure. See Dkt. Nos. 22-13 to -17.

3

Plaintiff then applied $826,742.68 in proceeds from the sale of the NY Property to the principal balance on the NY Notes, and $70,478.48 in proceeds from the sale of the FL Property to the principal balance on the FL Term Note.  Pl.'s S.M.F. ¶¶ 24-25; Def.'s Resp. S.M.F. ¶¶ 24-25. Plaintiff claims that the remaining balance on the FL Term Note was $124,437.12 after application of the sale proceeds.  Compl. ¶ 21.  Plaintiff claims that the balance on the NY Term Note and the NY Line-of-Credit Note as of June 25, 2012, was $568,081.41 and $158,633.70, respectively.  Pl.'s S.M.F. ¶¶ 26-27.  As required by the Agreements, Plaintiff thereafter recorded discharges of the mortgages securing the Notes.  Pl.'s S.M.F. ¶ 18; Def.'s Resp. S.M.F. ¶ 18; Pl.'s Resp. S.M.F. ¶ 15.

Defendant claims that prior to her execution of the Agreements, she and Plaintiff entered into a "verbal" agreement that Plaintiff would accept the net proceeds of the sales of the Properties in full satisfaction of Defendant's obligations on the Notes.  Def.'s S.M.F. ¶¶ 8-10.[2]  Defendant further claims that this agreement is embodied in the FL Agreement but not in the NY Agreement. Id. ¶¶ 9-10.  The NY Agreement parallels the FL Agreement in most material respects; however, the NY Agreement contains an additional clause that expressly reserves Plaintiff's right to recover the deficiency balance on the NY Notes after the short sale of the NY Property.  Compare Dkt. No. 16-10, with Dkt. No. 22-19.  The parties agree that in the interval between the execution of the Agreements, Plaintiff did not communicate to Defendant its intention to insert the additional clause into the NY Agreement.  Def.'s S.M.F. ¶ 11; Pl.'s Resp. S.M.F. ¶ 11.

Plaintiff denies that its negotiations with Defendant included a release of Defendant's obligations on the Notes after a short sale of the Properties or that Plaintiff entered into an oral

---

[2] The Court notes that Defendant likely means that she entered into an "oral" agreement with Plaintiff, as there is no indication from her briefs or the evidence she submitted in support of her Cross-Motion that there was another written agreement preceding the Agreements.

agreement with Defendant to that effect.  Pl.'s Resp. S.M.F. ¶¶ 4, 9-10.  The Agreements do not, therefore, in Plaintiff's view, embody such an agreement and do not preclude Plaintiff from recovering the remaining balance on the Notes in this action.

### B. Procedural Background

Plaintiff filed its Complaint on July 6, 2011.  Compl.  In its Complaint, Plaintiff alleges four causes of action.  The first, second, and third causes of action are for breach of the NY Term Note, NY Line-of-Credit Note, and FL Term Note, respectively.  Id.  ¶¶ 29-40.  The fourth cause of action is for attorney's fees and costs resulting from Plaintiff's collection efforts.  Id. ¶¶ 41-42.  As relief for Defendant's alleged default on the Notes, Plaintiff asks the Court to enter judgment against Defendant in the total amount due on the Notes plus prejudgment interest and the aforementioned fees and costs.  Id. at 6.

Defendant filed an Answer to the Complaint on November 21, 2011, asserting therein nine affirmative defenses to Plaintiff's claims on the Notes.  Dkt. No. 12 ("Answer").  In the order that they appear in the Answer, Defendant's affirmative defenses are that Plaintiff's claims are barred because: (1) Plaintiff failed to bring them before the statute of limitations in § 1371 of New York's Real Property Actions and Proceedings Law ("RPAPL") expired; (2) Plaintiff knowingly and voluntarily released them; (3) Plaintiff knowingly discharged them; (4) Plaintiff knowingly satisfied them; (5) Plaintiff knowingly entered into an accord with Defendant in connection with them; (6) Plaintiff knowingly waived them; (7) the doctrine of estoppel or promissory estoppel applies with regard to them; (8) Plaintiff and Defendant entered into a novation in connection with them; and (9) the doctrine of ratification applies.  See id. ¶¶ 3-11.

On August 1, 2012, Plaintiff filed its Motion for partial summary judgment.  Mot.  In its

Motion, Plaintiff seeks summary judgment on the Complaint's first, second, and fourth causes of action and asks that the Court enter judgment in its favor in the amount of $726,715.11 (the balance allegedly remaining on the NY Notes) plus attorney's fees and costs.  Plaintiff's Memorandum of law in support of its Motion for partial summary judgment (Dkt. No. 16-2) ("Pl.'s Mem.") at 11. Defendant in turn filed her Cross-Motion for summary judgment on September 26, 2012.  Cross-Mot.  In her Cross-Motion, Defendant seeks summary judgment on each of her affirmative defenses and asks the Court to dismiss the Complaint in its entirety.  Defendant's Memorandum of law in support of her Cross-Motion for summary judgment (Dkt. No. 22-1) ("Def.'s Mem.") at 1.

### III.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of a material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party shows that there is no genuine dispute as to any material fact, the burden shifts to the nonmoving party to demonstrate "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id.  This requires

6

the nonmoving party to do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986).

At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). A court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.    DISCUSSION

### A.  Choice of Law

Subject-matter jurisdiction in this case is based on diversity of citizenship under 28 U.S.C. § 1332. Compl. ¶ 4. Although neither party has explicitly addressed the choice-of-law question that arises when an action is brought under diversity jurisdiction, the parties' briefs assume that New York law controls the issues presented in this case. See generally Pl.'s Mem.; Def.'s Mem. "[S]uch implied consent is, of course, sufficient to establish the applicable choice of law." Arch Ins. Co. v. Precision Stone, Inc., 584 F.3d 33, 38-39 (2d Cir. 2009) (quoting Golden Pacific Bancorp. v. F.D.I.C., 273 F.3d 509, 513 n.4 (2d Cir. 2001)). The Court therefore applies New York law in resolving the Motion and Cross-Motion.

### B.  The Notes

"To establish a prima facie case of default on a promissory note under New York law, a plaintiff must provide proof of the valid note and of [the] defendant's failure, despite proper demand, to make payment." Genger v. Sharon, No. 10 Civ. 4506, 2012 WL 6628037, at *6

7

(S.D.N.Y. Dec. 20, 2012) (citing Cavendish Traders, Ltd. v. Nice Skate Shoes, Ltd., 117 F. Supp. 2d 394, 399 (S.D.N.Y. 2000)).  Summary judgment is therefore appropriate in an action on a promissory note "if there is no material question concerning execution and default of the note." United States v. Galarza, No. 10-CV-894, 2011 WL 256536, at *1 (E.D.N.Y. Jan. 26, 2011).  "A plaintiff meets his burden for summary judgment on a promissory note by presenting evidence of execution of the note, and asserting, without dispute from the defendant, that the defendant failed to pay." Lau v. Mezei, No. 10-CV-4838, 2012 WL 3553092, at *4 (S.D.N.Y. Aug. 16, 2012) (citing Valley Nat'l Bank v. Oxygen Unlimited, LLC, No. 10 Civ. 5815, 2010 WL 5422508, at *3 (S.D.N.Y. 2010)).  "When it is 'undisputed that the [n]ote is valid and that [the defendant] has failed to make payment,' summary judgment is appropriate." Id. (quoting Lehman Bros. Holdings Inc. v. Walji, No. 09-CV-1995, 2011 WL 1842838, at *3 (S.D.N.Y. May 11, 2011)).

Both parties submitted copies of the Notes with their papers.  Dkt. Nos. 16-5, 16-6, 22-5 to -7, 28-3.  Defendant does not dispute that the Notes are valid promissory notes that she executed and later failed to pay after Plaintiff made proper demand.  See Pl.'s S.M.F. ¶¶ 4-6, 8-13; Def.'s Resp. S.M.F. ¶¶ 4-6, 8-13.  See generally Def.'s S.M.F.; Def.'s Mem.; Defendant's Reply memorandum of law (Dkt. No. 30) ("Def.'s Reply").  Instead, Defendant argues that Plaintiff has failed to establish its *prima facie* case of default, and is therefore not entitled to summary judgment, because it has not produced original, "wet ink" versions of the Notes.  Def.'s Mem. at 20-22.  According to Defendant, § 3-307 of New York's enactment of the Uniform Commercial Code ("NY UCC") requires a plaintiff seeking recovery on a promissory note to produce the original note.  Id. at 20-21.  If a plaintiff fails to produce the original note, Defendant contends, then a plaintiff must satisfy the requirements of NY UCC § 3-804.  Id. at 21.

8

Defendant's arguments are meritless because she confuses when §§ 3-307 and 3-804 apply and what each section requires as proof.  By its terms, § 3-804 applies only when a plaintiff has shown that she has "lost" the note in question.  Where a note has been lost and the defendant contests its existence and authenticity, a plaintiff may not rely on copies of the note to establish her *prima facie* case.[3]  See Genger, 2012 WL 6628037, at *7 & n.94 ("[P]laintiffs . . . produce[d] . . . only incomplete copies of the [n]ote . . . .  The fact that no original of the [note] has been located, and the fact that defendants dispute that a complete original *ever* existed, places plaintiffs within N.Y.U.C.C. § 3-804 . . . ." (emphasis in original)).

Section § 3-307, by contrast, applies when a plaintiff still has possession of the note.  In that situation, a plaintiff may support its *prima facie* case with copies of the note so long as "the existence of the original writings and the authenticity and accuracy of the copies are not disputed." Cavendish Traders, 117 F. Supp. 2d at 399 n.8 (citing Chamberlain v. Amato, 688 N.Y.S.2d 345, 346 (App. Div. 1999)); see also Genger, 2012 WL 6628037, at *7 n.94.

Here, Plaintiff asserts that it has maintained possession of the original Notes since their inception and has made them available for Defendant's review at Plaintiff's place of business in Massachusetts.  Pl.'s Opp. at 19 (citing Dkt. No. 26 ¶¶ 1-5; Dkt. No. 25-3 ¶ 1).  Defendant does not dispute that she executed the original Notes or that the copies submitted by Plaintiff are authentic and accurate.  Indeed, Defendant effectively concedes these points by submitting copies of the Notes

---

[3] Section 3-804 provides two ways for a plaintiff to recover on a lost note: (1) by providing proof of the plaintiff's ownership of the note, the note's terms, and the reasons why plaintiff could not produce it; or (2) by posting "security, in an amount fixed by the court not less than twice the amount allegedly unpaid on the instrument, indemnifying the defendant, his heirs, personal representatives, successors and assigns, against loss, including costs and expenses, by reason of further claims on the instrument."

in support of her Cross-Motion.  Dkt. Nos. 25-5 to -7.  And although Defendant vaguely asserts that it is *possible* that Plaintiff no longer has possession of the original notes, she points to no facts in the record showing that this assertion is anything more than speculation on her part.  See Def.'s Mem. at 20-22; Def.'s Reply at 9-10.  The Court is therefore not convinced that a genuine factual issue exists as to whether Plaintiff is the current holder of the notes.  Plaintiff has therefore met its burden of establishing a *prima facie* case of default.  See Cavendish Traders, 117 F. Supp. 2d at 399 n.8; Lau, 2012 WL 3553092, at *4 (finding a copy of an executed note, the authenticity and accuracy of which had not been disputed by the defendant, sufficient to establish a plaintiff's *prima facie* case).  Consequently, Plaintiff has also established that it is entitled to summary judgment on its first, second, and fourth causes of action if the Court concludes that Defendant's affirmative defenses to the enforcement of the NY Agreement are meritless.

### C. The Short Sale Agreements

#### 1. RPAPL § 1371

Defendant argues that this action is barred in its entirety by RPAPL § 1371.  Pl.'s Mem. at 6-11.  Section 1371 is located within Article 13 of RPAPL, which governs actions to foreclose on mortgages, and is entitled "Deficiency judgment."  Subsection (1) of § 1371 provides that

> [i]f a person who is liable to the plaintiff for the payment of the debt secured by the mortgage is made a defendant in the action, and has appeared or has been personally served with the summons, the final judgment may award payment by him of the whole residue, or so much thereof as the court may determine to be just and equitable, of the debt remaining unsatisfied, after a sale of the mortgaged property and the application of the proceeds, pursuant to the directions contained in such judgment, the amount thereof to be determined by the court as herein provided.

Subsection (2) requires that a motion for a deficiency judgment be brought within 90 days of the deed for the foreclosed property passing from the foreclosure-sale referee's control.  N.Y. RPAPL

10

§ 1371(2); <u>Arbor Nat'l Commercial Mortg., LLC v. Carmans Plaza, LLC</u>, 759 N.Y.S.2d 683, 684 (App. Div. 2003) ("The courts have uniformly treated the 90-day period contained in RPAPL 1371(2) as a provision in the nature of a statute of limitations, so that the plaintiff's failure to serve notice within the 90-day period is a complete bar to the entry of a deficiency judgment . . . ." (citations omitted)); <u>Lennar Northeast Partners Ltd. v. Gifaldi</u>, 695 N.Y.S.2d 213, 215 (Sup. Ct. 1998) ("[T]he date the deed passed beyond the Referee's control begins the limitation period.").  If such a motion is not brought within the 90-day "statute of limitations" period, subsection (3) provides that "the proceeds of the sale regardless of amount shall be deemed to be in full satisfaction of the mortgage debt and no right to recover any deficiency in any action or proceeding shall exist."  N.Y. RPAPL § 1371(3).

According to Defendant, the requirements of § 1371 apply in this case because § 1371 and its legislative history demonstrate that a mortgagee may obtain a deficiency judgment in New York only through "a mortgage foreclosure action wherein the defendant is named and served and given the opportunity to assert her equity of redemption, enjoy the benefits of a competitive auction at a judicially supervised foreclosure sale and defend herself against an excessive deficiency judgment." <u>Id.</u> at 8.  Because § 1371 is allegedly the "sole path" to a deficiency judgment, Defendant argues that the NY Agreement, which contains the additional sentence reserving Plaintiff's right to recover the deficiency balance on the NY Notes, impermissibly "circumvents" § 1371's protections for mortgagors and is therefore unenforceable.  <u>Id.</u> 10-11.  Furthermore, Defendant contends that because Plaintiff did not name her in a foreclosure action on the New York and Florida properties, Plaintiff "waived" its right to seek a deficiency judgment on the Notes under subsection (1) of

§ 1371.[4]  Def.'s Mem. at 8.  Defendant contends, finally, that Plaintiff's claims on the Notes are

time-barred because Plaintiff did not bring this action until well after subsection (2)'s 90-day

limitations period had expired.  Id. at 8-9.

Plaintiff responds to Defendant's arguments by asserting that § 1371, by its terms and

location within RPAPL, applies only in the context of a foreclosure action and does not bar a

plaintiff from recovering on a defaulted note after the private sale of the property securing it.

Plaintiff's Memorandum of law in opposition to Defendant's Cross-Motion (Dkt. No. 25) ("Pl.'s

Opp.") at 7-11.

The Court finds that Defendant has failed to establish that New York has a strong public

policy requiring deficiency judgments to be procured only within a foreclosure action.  Whether

taken individually or collectively, the cases that Defendant cites demonstrate only that New York

has prohibited a mortgagee from maintaining an action to foreclosure on a mortgaged property and a

separate action to recover a money judgment on the promissory note secured by the same mortgage.

Indeed, Sanders v. Palmer, 499 N.E.2d 1242, 1244-45 (N.Y. 1986), which Defendant relies on

heavily to support her argument, states that one of § 1371's two main purposes is to avoid multiple

lawsuits, one in equity and the other in law, on the same mortgage.  Sanders goes on to explain that

§ 1371 and its predecessor statutes were enacted against the background of the Great Depression,

when many homeowners lost their homes in foreclosure sales at prices that did not reflect the

property's "real value."  See id. at 1244 (quoting Public Papers of Herbert H. Lehman, 1933, at 140,

---

[4] In her Memorandum of law, Defendant does not explicitly identify which of her arguments
corresponds with which of her affirmative defenses.  See generally Def.'s Mem.  Based on
Defendant's use of the word "waived" in this argument, and the absence of any similar language in
any of her other arguments, the Court finds that this argument corresponds with her sixth affirmative
defense.  See Answer ¶ 8.

141-42).  Such foreclosure sales often resulted in lenders seeking "exaggerated" deficiency judgments against the homeowners.  See id.  According to Sanders, § 1371's second purpose, then, is to "benefit the mortgagor and burden the mortgagee" by: (1) requiring the deficiency amount to be determined with reference to the market value of the foreclosed property or its sale price, whichever is higher; and (2) deeming the proceeds of the foreclosure sale to be in full satisfaction of the outstanding debt if a deficiency judgment is not sought within the 90-day limitations period.  See id. 1243-45.

The facts of this case do not implicate § 1371's purposes or the concerns it was enacted to address.  First, it is undisputed that Plaintiff never filed an action to foreclose on the Properties. Thus, Plaintiff cannot possibly run afoul of § 1371's first purpose of protecting mortgagors from having to defend against both a foreclosure action and a separate deficiency action.  Second, Defendant chose to sell the Properties, as opposed to being forced to sell them because they had been foreclosed upon, and she did so over time on the open market, not on a set date at a foreclosure sale.  As Plaintiff has correctly explained in its Opposition, "in a foreclosure sale, the borrower has no control over the sale price; for a private short sale to occur, by contrast, the borrower must execute the purchase and sale agreement."  Pl.'s Opp. at 11.  These circumstances mitigate any concerns that Defendant will be subjected to an "exaggerated" judgment that has no relation to the "real value" of the Properties.

In addition, while it is true that Plaintiff did not satisfy the requirements of § 1371 by naming Defendant in a foreclosure action and bringing a motion for a deficiency judgment within that section's limitations period, these failures do not preclude Plaintiff's claims on the Notes. Section 1371 simply does not apply in this case because the necessary predicate for its

13

application—a foreclosure action—is missing.  The cases that Defendant cites in support of her

contrary contention are inapposite because they apply § 1371 to situations in which a foreclosure

action and sale have, in fact, taken place.  See Pl.'s Opp. at 9-10 (providing a chart demonstrating

this fact).  The Court therefore finds no basis under New York law for applying § 1371 to the facts

of this case and barring Plaintiff from recovering the balance remaining on the Notes.

### 2. Facial Ambiguity in the Agreements

The parties dispute whether the Agreements are ambiguous with regard to the effect each has

on the balance remaining on the Notes after the sale of the Properties.  Def.'s Mem. at 14-16; Pl.'s

Opp. at 2-4.  "Whether a contract is ambiguous is a question of law for the court and is to be

determined by looking 'within the four corners of the document.'"  Triax Capital Advisors, LLC v.

Rutter, 921 N.Y.S.2d 54, 56 (App. Div. 2011) (quoting Kass v. Kass, 696 N.E.2d 174, 180 (N.Y.

1998)).  A contract is unambiguous if "on its face [it] is reasonably susceptible of only one

meaning."  Id. (quoting Greenfield v. Philles Records, 780 N.E.2d 166, 170 (N.Y. 2002)) (internal

quotation marks omitted).  Conversely, "[a] contract is ambiguous if the provisions in controversy

are reasonably or fairly susceptible of different interpretations or may have two or more different

meanings."  Id. (quoting Feldman v. Nat'l Westminster Bank, 760 N.Y.S.2d 3, 5 (App. Div. 2003))

(internal quotation marks omitted).

"The existence of ambiguity is determined by examining the 'entire contract and

consider[ing] the relation of the parties and the circumstances under which it was executed,' with

the wording to be considered 'in the light of the obligation as a whole and the intention of the

parties as manifested thereby.'"  Id. (quoting Kass, 696 N.E.2d at 180-81).  The "intent of the parties

must be found within the four corners of the contract, giving a practical interpretation to the

language employed and the parties' reasonable expectations." Id. (quoting Del Vecchio v. Cohen, 733 N.Y.S.2d 479, 480 (App. Div. 2001)) (internal quotation marks omitted).

> [W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.  Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.

W.W.W. Assocs., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990) (citations omitted).  This rule imparts "stability to commercial transactions" and is therefore "all the more compelling in the context of real property transactions, where commercial certainty is a paramount concern."  Id.

Before turning to its interpretation of the Agreements, the Court first concludes that it may not read the Agreements together.  Although the Agreements are between the same parties and contain many identical terms, they were executed months apart; involve the sale of different properties at vastly different prices; relate to different promissory notes evidencing loans in vastly different amounts; and do not in any way make reference to each other.  In sum, despite their surface similarity, the Agreements represent two unrelated transactions and therefore the Court must read the Agreements individually.  See BWA Corp. v. Alltrans Express U.S.A., 493 N.Y.S.2d 1, 3 (App. Div. 1985) ("Where several instruments constitute part of the same transaction, they must be interpreted together.  In the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eye of the law, one instrument."); see also Europacific Asset Mgmt. Corp. v. Tradescape Corp., No. 03 Civ. 4556, 2005 WL 497787, at *12 (S.D.N.Y. 2005) (applying New York law in choosing to read two contracts together because they constituted part of the same transaction); 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 30:26 (4th ed. 1990) (summarizing the law regarding the interpretation of

interrelated contracts).

a.  The FL Agreement

The FL Short Sale Agreement contains an initial "re:" line that identifies: (1) the subject loan, by Plaintiff's reference number; (2) Defendant as the borrower on that loan; and (3) the FL Property.  Dkt. No. 22-19 at 2.[5]  There is no dispute that the loan identified is the one evidenced by the FL Term Note.  The next line of the Agreement reads: "[Plaintiff] and [Defendant] hereby agree to a short payoff of your loan, subject to the following terms and conditions."  Id.  Ten numbered paragraphs follow.  The first paragraph states that "[t]he net proceeds to [Plaintiff] from the sale of the property must not be less than $70,478.48."  Id. at 2, ¶ 1.  The sixth paragraph states that "[a]ny funds held in Borrower's escrow impound account and/or any insurance claim proceeds relating to the loan will be considered the property of [Plaintiff] and will be applied toward [Plaintiff's] loss."  Id. at 3, ¶ 6.  The ninth paragraph states that upon Defendant's compliance with the terms and conditions of the FL Agreement, "and upon clearing of any net proceeds funds, Berkshire Bank will prepare and submit for recording through its normal channels a release of the mortgage or deed of trust that secures the loan."  Id. at 3, ¶ 9.  The tenth and final numbered paragraph informs Defendant "that any principal balance on the Loan that is written off as a result of this Agreement, will be subject to by law to any applicable legal reporting requirements promulgated by the IRS, which could, mean that [Defendant] is subject to the receipt of a 1099C."[6]  Id. at 4, ¶ 10.

---

[5] In referring to specific pages in the FL Agreement, the Court uses the numbers electronically added to the top of each page by the Clerk of the Court, not the numbers on the bottom of each page.

[6] The Court takes judicial notice that a "1099C" is an IRS form used to report debt that has been discharged by a federal government agency or another qualifying lender.  See FED. R. EVID. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because

The Court concludes that the FL Agreement is reasonably susceptible of only one meaning and is therefore unambiguous. That meaning, however, is the one advocated by Defendant, not Plaintiff. Read in the context of the entire agreement, the phrase "short payoff of your loan" clearly means that the FL Agreement would result in Defendant's obligations on the FL Term Note being "paid off" in full.[7] Nothing in the first paragraph can reasonably be read to limit the FL Agreement to an agreement for a one-time payment against the balance on the FL Term Note that leaves Defendant obligated on the remainder. Rather, the first paragraph merely suggests that Plaintiff would accept only a certain minimum sum of money from the sale of the FL Property before it would agree to forgive Defendant's remaining obligation on the FL Term Note. That Plaintiff

---

it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). These forms are publicly available on the IRS's website at http://www.irs.gov/pub/irs-pdf/f1099c.pdf.

[7] Plaintiff's arguments concerning the meaning of the word "payoff" are unconvincing. See Pl.'s Opp. at 4. Reading "payoff" to be used in its time sense (as in, the time at which a payment is made) makes little sense in context. The same is true for reading "payoff" to mean simply a one-time payment. Plaintiff could have—and should have—used the word "payment" if that is what it meant. A search of New York case law shows that "payoff," when unaccompanied by language specifically limiting it to a certain amount, is used almost universally to mean payment of a debt in full. See, e.g., 4 B's Realty 1530 CR39, LLC, v. Toscano, 818 F. Supp. 2d 654, 659 (E.D.N.Y. 2011) ("[The defendant] was justified in refusing to unconditionally meet the [p]laintiff's payoff demand in December 2008."); Donerail Corp. N.V. v. 405 Park LLC, 952 N.Y.S.2d 137, 144 (App. Div. 2012) ("Of course, no rational seller would pay off a mortgage in advance of the closing, because if the closing failed to occur, the seller would have lost the mortgage loan."); N.Y. Community Bank v. Vermonty, 892 N.Y.S.2d 137, 139 (App. Div. 2009) ("The Bank sent the sheriff a payoff letter, stating that the total amount due to satisfy the mortgage loan on [the defendant's] property was $105,751.29."); Deutsche Bank Nat'l Trust Co. v. Bills, No. 1027-09, 2012 WL 4868108, at *4 n.5 (N.Y. Sup. Ct. 2012) (Table) ("[The party] avers only that she . . . did not receive or cash the payoff check for the Countrywide mortgage loan in the amount of $760,895.21 . . . ."). Furthermore, the Court notes that one of the online dictionaries Plaintiff uses to define "payoff" also provides an example of that word used to mean the full payment of a debt. See DICTIONARY.COM, http://www.dictionary.com (last visited Mar. 22, 2013) (search for "payoff") ("The loan payoff amount may be more or less than the trade-in or market value of your vehicle.").

anticipated incurring a loss on the FL Term Note as a result of the FL Agreement is demonstrated by the language of the sixth paragraph, which specifically mentions Plaintiff's loss in unequivocal terms. Despite Plaintiff's arguments to the contrary, the ninth paragraph cannot reasonably be read to limit the FL Agreement to an agreement solely to discharge the mortgage securing the FL Term Note. The FL Agreement is, after all, for a "short payoff of [Defendant's] *loan*." Dkt. No. 22-19 at 1 (emphasis added). The Court finds it much more reasonable to read the ninth paragraph, in light of that initial phrase, to mean that the mortgage would be discharged to allow the FL Property to be transferred to a third-party purchaser free of encumbrances, thus permitting the short sale to take place. The tenth paragraph, like the sixth, shows that Plaintiff was aware that it might incur a loss as a result of the FL Agreement. The Court therefore concludes that the FL Agreement was intended by the parties to release Defendant from liability on the FL Term Note once Plaintiff received the proceeds of Defendant's sale of the FL Property provided they were at least $70,478.48.

### b.  The NY Agreement

The NY Agreement is practically identical to the FL Agreement but for the following material differences. First, the NY Agreement's "re:" line identifies the NY Notes and the NY Property as opposed to the FL Term Note and FL Property. Dkt. No. 16-10 at 2.[8] Next, the first paragraph requires that the net proceeds of the sale of the NY Property be no less than $826,742.68. Id. at 2, ¶ 1. Finally, and significantly, the ninth paragraph contains an additional sentence reading: "[Plaintiff] reserves the right to pursue any deficiency balance left on either loan, or both of them, against [Defendant]." Id. at 3, ¶ 9.

---

[8] In referring to specific pages in the NY Agreement, the Court uses the numbers electronically added to the top of each page by the Clerk of the Court, not the numbers on the bottom of each page.

18

Reading the NY Agreement as a whole, the Court concludes that its meaning is unambiguous. The Court finds that meaning to be the one advocated by Plaintiff, not Defendant. The first sentence of the NY Agreement containing the phrase "short payoff of your loans" is expressly made subject to the terms and conditions in the numbered paragraphs that follow it.[9] Id. at 1. Thus, the "short payoff" that the NY Agreement effects is expressly limited by the additional sentence in the ninth paragraph reserving Plaintiff's right to seek the deficiency balance on the NY Notes. The Court therefore concludes that the NY Agreement was *not* intended by the parties to release Defendant from liability on the NY Term Note.

### 3. Accord vs. Novation

Defendant argues that the Agreements were either executory accords or novations that provided for full satisfaction of her obligations on the Notes. Def.'s Mem. at 12-14. Under New York law, there can be no novation when the original contract has already been breached. In re Cohen, 422 B.R. 350, 372 (E.D.N.Y. 2010) (citing Wasserstrom v. Interstate Litho Corp., 495 N.Y.S.2d 217, 219 (App. Div. 1985)). Here, because it is undisputed that Defendant breached the Notes by defaulting on them, the Agreements cannot be novations.[10] Def.'s S.M.F. ¶ 2.

Under New York law, an executory accord is

---

[9] The Court notes that while the same is true for the FL Agreement, that fact does not change the Court's analysis.

[10] Furthermore, "[u]nder New York law, when parties agree to a 'novation,' the existing obligation is extinguished immediately by acceptance of a new agreement; however, if parties intend that under the new agreement, the existing claim would be discharged in the future by rendition of substituted performance, the new agreement is an 'executory accord.'" In re Cohen, 422 B.R. at 373. The parties clearly intended that whatever effect the Agreements would have on the Notes and mortgages, that effect would only come about in the future, after Defendant performed under the Agreements, and not immediately upon the execution of the Agreements.

19

> an agreement embodying a promise express or implied to accept at some future time a stipulated performance in satisfaction or discharge in whole or in part of any present claim, cause of action, contract, obligation, or lease, or any mortgage or other security interest in personal or real property, and a promise express or implied to render such performance in satisfaction or in discharge of such claim, cause of action, contract, obligation, lease, mortgage or security interest.

N.Y. GEN. OBLIG. LAW § 15-501(1). Historically, executory accords were unenforceable at common law. Denburg v. Parker Chapin Flattau & Klimpl, 624 N.E.2d 995, 1001 (N.Y. 1993). In New York, however, an executory accord is enforceable by statute if it is: (1) in writing; and (2) signed by the party against whom it is sought to be enforced. N.Y. GEN. OBLIG. LAW § 15-501. Plaintiff agrees with Defendant that the Agreements were enforceable executory accords, Pl.'s Opp. at 6, and the Court finds that the Agreements satisfy the requirements of § 15-501. A dispute remains, however, over whether the Agreements provided for a full or partial satisfaction of Defendant's obligations on the Notes.

The Court refers to its discussion in Part IV.C.2.a *supra* to conclude that the FL Agreement was an executory accord that provided for full satisfaction of Defendant's obligations on the FL Term Note. It is undisputed that Defendant sold the FL Property and transmitted the proceeds of the sale to Plaintiff according to the terms and conditions of the FL Agreement. Defendant has, therefore, satisfied the accord and is entitled to have Plaintiff's claim against her on the FL Term Note released. See N.Y. JUR. 2D *Compromise, Accord, and Release* § 29 ("By definition, an accord and satisfaction has the effect of barring enforcement of the original claim; no action may be maintained on an obligation which has been extinguished by an accord and satisfaction." (citing, *inter alia*, Ellis v. D.R. Watson Holdings, LLC, 875 N.Y.S.2d 380 (App. Div. 2009))). Accordingly, the Court grants Defendant's Motion for summary judgment dismissing Plaintiff's

third cause of action seeking recovery on the FL Term Note.[11]

Similarly, the Court refers to its discussion in Part IV.C.2.b *supra* to conclude that the NY Agreement was an executory accord that provided only for partial satisfaction of Defendant's obligation on the NY Notes and for discharge of the mortgages on the NY Property. Thus, although Defendant has satisfied the accord by selling the NY Property and transmitting the proceeds to Plaintiff, Defendant remains obligated on the NY Notes unless the Court finds merit in one of Defendant's remaining affirmative defenses.

### 3. Discharge

After Plaintiff received the proceeds from the short sale of the NY Property, it recorded a Discharge of Mortgage ("DOM") in the office of the Saratoga County Clerk. Pl.'s S.M.F. ¶ 18; Def.'s Resp. S.M.F. ¶ 18. The DOM acknowledges the release of the mortgages securing the NY Notes and then states, in an independent sentence, that "[t]he above mortgages were consolidated by agreement record November 26, 2007 as Instrument #2007-003358." Dkt. No. 22-26. Instrument #2007-00358 is a Consolidation, Extension and Modification Agreement ("CEMA") pertaining to the mortgages and attached to it is a copy of the NY Term Note. Plaintiff's Surreply to Defendant's Cross-Motion (Dkt. No. 34) ("Surreply") at 1.

Defendant argues that the sentence in the DOM referring to the CEMA acted as a release of the NY Term Note. Def.'s Reply at 7-8. Defendant also argues that Plaintiff "specifically and

---

[11] Plaintiff argues that Defendant is not entitled to summary judgment on the FL Term Note because Defendant has failed to demonstrate that the FL Agreement contains an express release. Pl.'s Opp. at 21. The FL Term Note and the NY Term Note both provide that "Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing." Dkt. Nos. 16-5, 28-3. The Court rejects Plaintiff's argument because it concludes that the FL Agreement is an unambiguous written release of Defendant's obligation on the FL Term Note.

expressly referred to the actual notes by dates and dollar amounts and recording information." <u>Id.</u>
The Court finds Defendant's arguments to be meritless.  First, the DOM's reference to the CEMA
cannot reasonably be read to intend the release of the CEMA, let alone the NY Term Note that was
merely attached to it.  Second, contrary to Defendant's contention, the DOM does not refer on its
face to the actual notes; it refers, instead, to the mortgages.  Under New York law, a note is a
separate instrument from the mortgage that secures it.  <u>F.D.I.C. v. Persaud</u>, No. 90 CV 4409, 1997
WL 139010, at *4 (E.D.N.Y. Mar. 5, 1997) (citing <u>Signal Fin. of N.Y., Inc. v. Polomaine</u>, 519
N.Y.S.2d 933, 934 (City Ct. 1987)); <u>Corey v. Collins</u>, 782 N.Y.S.2d 51, 52 (App. Div. 2004) ("The
note represents the primary personal obligation of the mortgagor, and the mortgage is merely the
security for such obligation." (quoting <u>Copp v Sands Point Marina</u>, 217 N.E.2d 654, 655 (N.Y.
1966))).  Therefore, the DOM does not operate to discharge Defendant's obligation on the NY
Notes.[12]  <u>See</u> <u>Cent. Nat'l Bank, Canajoharie v. Purdy</u>, 671 N.Y.S.2d 866, 867 (App. Div. 1998)
("[The defendant's] contention that the discharge of the mortgage operated as a satisfaction of the
underlying obligation is wholly without merit." (citing <u>Conn. Nat'l Bank v. Hack</u>, 588 N.Y.S.2d
180, 181 (App. Div. 1992))).

### 4. Estoppel

Defendant contends that the doctrines of promissory and equitable estoppel apply to bar this
action.  Def.'s Mem. at 17-20.  According to Defendant, the parties entered into an oral agreement

---

[12] To the extent that Defendant attempts to prove Plaintiff actually discharged her obligation
on the Notes by submitting credit-rating agency reports, those reports are inadmissible hearsay.
Def.'s S.M.F. ¶ 16; Dkt. No. 22-22.  Therefore, the Court cannot consider them in deciding the
Motion and Cross-Motion.  <u>Hollman v. Taser Intern'l Inc.</u>, No. 06-CV-3588, 2013 WL 864538, at
*5 (E.D.N.Y. Mar. 8, 2013) ("In deciding whether a motion for summary judgment should be
granted, a district court may only consider admissible evidence." (citing <u>Nora Beverages</u>, 164 F.3d
at 746)).

that Defendant's obligations on the Notes would be extinguished after the short sale of the

Properties.  Id. at 19.  Defendant claims that she relied on this alleged oral agreement in signing the

Agreements.  Id. at 19-20.

  The elements of promissory estoppel and equitable estoppel overlap for purposes of

Defendant's Cross-Motion.  "The elements of a cause of action based upon promissory estoppel are

a clear and unambiguous promise, reasonable and foreseeable reliance by the party to whom the

promise is made, and an injury sustained in reliance on that promise."  Rock v. Rock, 953 N.Y.S.2d

165, 167 (App. Div. 2012) (quoting Schwartz v. Miltz, 909 N.Y.S.2d 729, 731 (App. Div. 2010))

(internal quotation marks omitted).  Similarly, in order to prevail on the theory of equitable estoppel

under New York law, "the party seeking estoppel must demonstrate, with respect to himself, a lack

of knowledge of the true facts; reliance upon the con duct of the party estopped; and a prejudicial

change in position."  River Seafoods Inc. v. JPMorgan Chase Bank, 796 N.Y.S.2d 71, 74 (App. Div.

2005) (citing BWA Corp., 493 N.Y.S.2d at 3).

  It suffices for the Court to say here that Defendant has provided no evidence showing that

Plaintiff ever affirmatively promised to release Defendant's obligations on the Notes or that the

parties ever entered into such an oral agreement.[13]  First, the emails that Defendant relies on so

heavily as proof of an agreement do not establish that one was formed.  See Dkt. Nos. 22-13 to -17,

-21.  Second, in her Statement of material facts, Defendant cites only to a paragraph in her Affidavit

that neither expressly states nor even suggests that an agreement was formed.  Def.'s S.M.F. ¶ 8.

That paragraph reads: "While negotiating the full payment and satisfaction of the Florida Mortgage,

---

  [13] The Court also finds convincing Plaintiff's detailed arguments in its Opposition as to why these doctrines do not apply to the facts of this case.  Pl.'s Opp. at 11-18.

Berkshire never again asked me about signing a note or otherwise covering deficiency.  I was relieved and felt that this chapter of my life was behind me."  Tedeschi Aff. ¶ 33.  Therefore, there is nothing in the record that would justify the Court's exercise of its equitable powers to estop the enforcement of the NY Agreement as it is written.[14]

Likewise, Defendant has failed to present any evidence demonstrating fraud on the part of Plaintiff's counsel in inserting the reservation-of-rights sentence in the NY Agreement.  A defendant cannot avoid the consequences of an agreement she has willingly signed by making such unsupported allegations.  This is especially true here b ecause Defendant has admitted to being a "very sophisticated businesswoman" but has also admitted to reading only the first page of the NY Agreement.  Pl.'s S.M.F. ¶ 20 (citing Dkt. No. 16-3 at 40:18-23); Def.'s Resp. S.M.F. ¶ 20.  New York law does not recognize the failure to read a contract before signing it as a valid reason not to enforce the contract.  E.g., Sofio v. Hughes, 556 N.Y.S.2d 717, 718-19 (App. Div. 1990) ("A party who signs a document without any valid excuse for having failed to read it is 'conclusively bound' by its terms." (quoting Gillman v. Chase Manhattan Bank, 534 N.E.2d 824, 828 (N.Y. 1988))).  Given her experience in business dealings like the one a t issue in this case, Defendant should have known better than to rely solely on her assumption that the NY Agreement would be the same as the FL Agreement.

Accordingly, the Court grants Plaintiff's Motion  for summary judgment as to the Complaint's first and second causes of action.

---

[14] The Court notes that Defendant has failed to make any argument in her briefs concerning her ninth affirmative defense of ratification.  Because the Court finds that there is no evidence of an oral agreement to be ratified by Plaintiff, however, the Court denies Defendant's ratification defense.

**D.  Attorney's Fees**

The Complaint's fourth cause of action seeks reimbursement for the attorney's fees and costs Plaintiff incurred in bringing this action.  Compl. ¶¶ 41-42.  "[C]ourts applying New York law should not infer a party's intention to provide counsel fees as damages for a breach of contract unless the intention to do so is unmistakably clear from the language of the contract."  Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fin. Host Corp., 418 F.3d 168, 177 (2d Cir. 2005) (internal quotation marks and citations omitted).  Here, the NY Term Note and NY Line-of-Credit Note both explicitly require Defendant to reimburse Plaintiff for the attorney's fees and costs it incurred in enforcing them.  Dkt. No. 16-5, § 7(E); Dkt. No. 16-6 at 5.  Plaintiff has therefore met its initial burden of establishing Defendant's liability for attorney's fees and costs.

Accordingly, the Court grants Plaintiff's Motion as to the Complaint's fourth cause of action.  The amount of fees and costs to be awarded to  Plaintiff will be determined by the Court on separate motion to be filed within 14 days of the date of this Memorandum-Decision and Order.

Defendant also argues that she is entitled to be reimbursed for the fees and costs she has incurred in defending against this action under § 282 of New York's Real Property Law ("RPL").  Def.'s Mem. at 22.  Although Defendant is a prevailing mortgagor and therefore entitled to fees and costs under § 282, she has not made her request in a counterclaim as required by that section.[15]  The

---

[15] Section 282, subsection (1) provides:

Whenever a covenant contained in a mortgage on residential real property shall provide that in any action or proceeding to foreclose the mortgage that the mortgagee may recover attorneys' fees and/or expenses incurred as the result of the failure of the mortgagor to perform any covenant or agreement contained in such mortgage, or that amounts paid by the mortgagee therefor shall be paid by the mortgagor as additional payment, there shall be implied in such mortgage a covenant by the mortgagee to pay to the mortgagor the reasonable attorneys' fees and/or expenses incurred by the

Court therefore denies Defendant's request for fees and costs in this action.

**V.     CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Plaintiff's Motion (Dkt. No. 16) for partial summary judgment on the

Complaint's (Dkt. No. 1) first, second, and fourth causes of action is **GRANTED**; and it is further

**ORDERED**, that Defendant's Cross-Motion (Dkt. No. 22) for summary judgment is

**GRANTED in part** and **DENIED in part** consistent with this Memorandum-Decision and Order;

and it is further

**ORDERED**, that the Complaint's (Dkt. No. 1) third cause of action is **DISMISSED with**

**prejudice**; and it is further

**ORDERED**, that Defendant shall pay Plaintiff's attorney's fees and costs in an amount to be

determined by the Court at a later date.  Plaintiff is ordered to file a motion concerning the amount

of attorney's fees and costs for which it seeks reimbursement within **fourteen (14) days** of the date

of this Memorandum-Decision and Order.  Defendant shall then have **fourteen (14) days** from the

filing date of Plaintiff's motion to respond; and it is further

---

mortgagor as the result of the failure of the mortgagee to perform any covenant or agreement on its part to be performed under the mortgage or in the successful defense of any action or proceeding commenced by the mortgagee against the mortgagor arising out of the contract, and *an agreement that such fees and expenses may be recovered as provided by law in* an action commenced against the mortgagee or by way of counterclaim in any action or *[a] proceeding commenced by the mortgagee against the mortgagor*.  Any waiver of this section shall be void as against public policy.

N.Y. RPL § 282(1) (emphasis added).  The Court notes, however, that § 282 also provides that a prevailing mortgagor may recover its attorney's fees and costs through a separate action commenced against the mortgagee.  Id.

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on the parties.

**IT IS SO ORDERED**.

DATED:         March 27, 2013
                    Albany, New York

Lawrence E. Kahn
U.S. District Judge

27